FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 2 0 2012

JAMES W. McCORMACK, CLERK
By: _____ Solo
DEP CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

WALTER D. CLARK, *et al.*                                    **PLAINTIFF**

VS.                        CASE NO. 4:12 cv525 BSM

BANK OF AMERICA, N.A.                                    **DEFENDANT**

**JURY TRIAL DEMANDED**

## COMPLAINT

Comes the Plaintiff, Walter D. Clark, acting individually and on behalf of all other

persons similarly situated, and for his Complaint and demand for jury trial states and alleges as

follows:

This case assigned to District Judge Miller

and to Magistrate Judge Kearney

## INTRODUCTION

1.      This is a civil action seeking class certification and monetary damages, restitution

and declaratory relief from Defendant, Bank of America, N.A. ("Bank of America," the "Bank,"

or "Defendant"), arising from its facilitation of, and failure to prevent, the freezing, garnishment,

or other seizure of federally protected benefits in violation of federal law; its failure to comply

with federal regulations governing the garnishment of these federally protected benefits; and its

improper, unfair, and unconscionable assessment and collection of fees and penalties related to

the freezing, garnishment, or other seizure of these federally protected benefits.  As detailed

below, Defendant's actions and omissions breach its contract with Clark and the proposed class;

breach the covenant of good faith and fair dealing; constitute acts of conversion; are

substantively and procedurally unconscionable; and have resulted in Defendant's unjust

enrichment.

2.      There is a deeply rooted commitment and tradition in America both to provide a

safety net for the elderly and other vulnerable members of our society and to honor the

obligations we have undertaken towards those who have served our country.  In order to ensure that our poor, our elderly, our federal pensioners, and our veterans may meet their most basic needs, Congress has enacted multiple statutes protecting federally-issued benefits from garnishment or attachment by creditors seeking payment for outstanding debts, including funds administered by the Social Security Administration (SSA), Department of Veterans Affairs (VA), Office of Personnel Management (OPM), or Railroad Retirement Board (RRB) (collectively "federally protected benefits," "protected benefits," or "exempted funds").  While these federal benefit laws state that creditors cannot take protected benefits to pay a debt, they do nothing – standing alone – to explain how money deposited directly into bank accounts is to be protected; and over the past decade the improper seizure of exempted funds from beneficiaries' bank accounts has become an increasing problem, prompting public outcry and new government regulation adding additional protections in 2011.

3.     The improper seizure of exempted funds is not a small-scale, isolated phenomenon.  A July 2008 report compiled by the Social Security Administration estimated that, over a one-year period, $177.7 million in exempted funds had been garnished and taken from accounts containing Social Security benefits, alone.[1]  The results are catastrophic where, as is the case for at least one-third of recipients, the benefits comprise over 90% of household income.  In such cases, where an account is improperly frozen or seized, citizens are unable to pay for necessities like food, clothing or shelter for weeks at a time or even longer.

4.     The costs associated with, and the profits arising from, these improper levies do not stop with the creditor.  Garnishee banks commonly charge a flat fee – typically $125 – for

---

[1] Office of the Inspector Gen., Soc. Sec. Admin., Cong. Response Report, Financial Institutions Deducting Fees and Garnishments From Social Security Benefits, A-15-08-28031, at 9 (2008) (available at http://oig.ssa.gov/congressional-response-report-financial-institutions-deducting-fees-and-garnishments-social-security)

processing the garnishment order, and as the entirety of an account balance is often frozen or released to the creditor, any outstanding checks or debit authorizations will add overdraft fees as well. Thus, an accountholder's woes do not stop at the fact that funds that *should* be available are not. Instead, banks will often rack up hundreds of dollars in unjust and improper fees, adding a needless expense that accountholders cannot afford. It is estimated that one million accounts containing federal benefits are garnished, annually.[2] Even assuming no other fee beyond the garnishment processing fee was assessed—and as discussed, *infra*, it is a certainty that this is not the case—the garnishment of accounts containing exempt funds generates, at a minimum, $125 million in improper and illegal revenue for financial institutions each year.

5.    Working to fill the regulatory vacuum, and to prevent the most vulnerable members of society from having their incomes decimated, the U.S. Department of the Treasury issued a series of regulations, codified at 31 C.F.R. § 212, *et seq.* ("31 C.F.R. 212") and made effective May 1, 2011, that completely altered the federal benefit protection landscape. As of May 1, 2011, under these regulations a financial institution has an affirmative duty, upon receipt of a garnishment order against one of its account holders, to review deposits made into the affected account for the prior two months. 31 C.F.R. § 212.5. If, in this window, the accountholder has received federally protected benefits, the financial institution must protect the lesser of (1) the sum of the benefits deposited in the two month period or (2) the balance of the account at the time of the review. *Id.* at §§ 212.5–212.6. This amount may not be frozen or released, and the financial institution is prohibited from charging or collecting a fee against the protected amount. *Id.* at § 212.6(h). Further, the financial institution is required to send the

---

[2] http://articles.marketwatch.com/2011-05-03/finance/30796642_1_prepaid-cards-social-security-benefits-bank-account

accountholder notice not only of the garnishment, but also of the very fact that the financial institution is obligated to comply with these new regulations. *Id.* At § 212.7.

6.    In order to offset any burdens associated with a financial institution's investigation of whether benefits have been deposited into a given account, the Treasury also established a unique coding system for payments issued by the SSA, VA, RRB, and OPM in order to facilitate easy identification of protected funds.  One of the banking industry's leading advocacy groups, the American Bankers Association, touted this as a "key" development that would "substantially improve" a bank's ability to comply with 31 C.F.R. 212.[3]

7.    The protections established under the Department of the Treasury are self-executing.  The debtor is not required to take any independent actions in order to protect the exempted funds in his or her account. *See, e.g.,* 31 C.F.R. § 212.1 (the procedures established in 31 C.F.R. "must" be followed by all financial institutions).

8.    The acts complained of herein demonstrate that Bank of America has refused to comply with 31 C.F.R. 212.  In so doing, the Bank has harmed, and continues to harm, its poorest and most vulnerable customers by facilitating the improper freezing, garnishment, or other seizure of their federally protected funds.

9.    Refusing to comply with the requirements of 31 C.F.R. 212, and thereby facilitating illegal garnishments, does not simply harm Bank of America's customers; it also has the effect of *benefiting* the Bank.  Where the Bank refuses to investigate into whether an account subject to a judgment creditor has exempt funds, it may simply pass the money along, charge the accountholder an administrative fee and, where the account is reduced to a balance of zero, the

---

[3] Letter from Mark Tenhundfeld, American Bankers Association, to Gary Grippo, U.S. Dept. of Treasury, *Re: Garnishment of Accounts Containing Federal Benefit Payments; Joint Notice of Proposed Rulemaking*, (Jun. 18, 2010).

Bank may charge overdraft fees on any outstanding checks or preauthorized debit transfers. None of this revenue would be available to the Bank, were it in compliance with federal law, its Deposit Agreement, and state laws.

10.    This case is a proposed class action brought against Bank of America on behalf of a national class of account holders for failing to protect federal benefits as required by law, illegally facilitating garnishments, and illegally charging garnishment fees and related fees.

## THE PARTIES

11.    Plaintiff Walter D. Clark ("Clark") is a resident of Lonoke County, Arkansas.

12.    Upon information and belief, Bank of America is a multinational banking and financial services company, operating in more than 150 countries.  Bank of America provides commercial, consumer, and mortgage banking services, as well as trust and financial planning services to Arkansas customers via its 51 branches and ATM locations in the state of Arkansas. As of June 30, 2012, Bank of America had assets of $2.1 trillion, with total deposits of $1 trillion.  Bank of America is a Delaware Corporation, headquartered at 100 N. Tryon St. in Charlotte, North Carolina.

## JURISDICTION AND VENUE

13.    This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because, on information and belief, the aggregate claims of the putative Class members exceed $5 million, exclusive of interests and costs, and Plaintiff Clark is a resident of a different state than Bank of America.

14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Bank of America is subject to personal jurisdiction here and regularly conducts business in the Eastern

District of Arkansas, and because a substantial part of the claims asserted herein occurred and continue to occur in this district.

## CLASS ALLEGATIONS

15.    Plaintiff brings this action individually and on behalf all others similarly situated pursuant to Arkansas Rules of Civil Procedure 23.    This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

16.    The proposed Class is defined as:

> All Bank of America customers in the United States who, on or after May 1, 2011, had their bank accounts frozen, garnished, or otherwise seized in a manner inconsistent with 31 C.F.R. 212, and/or who were subjected to penalties or other fees, by Bank of America, as a result.

17.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

18.    Excluded from the Class are Bank of America, its parents, subsidiaries, affiliates, officers and directors, any entity in which Bank of America has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

19.    The members of the Class are so numerous that joinder is impractical.  The Class consists of thousands of members, the identity of whom, upon information and belief, is within the knowledge of Bank of America and can be ascertained only by resort to Bank of America's records.

20.    The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all Class members, had his bank account frozen, garnished, or otherwise seized in violation of 31 C.F.R. 212, and was subjected to penalties and fees assessed by Bank of America as a result.  The representative Plaintiff, like all Class members,

has been damaged by Bank of America's misconduct, in that, as a result of the Bank's failure to comply with 31 C.F.R. 212, he has been deprived of access to his federally protected benefits, has been improperly assessed penalties and fees, and faces substantial risk of the same injury in the future, as the Bank has demonstrated that it is noncompliant with 31 C.F.R. 212 Furthermore, the factual basis of Bank of America's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

21.    There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

22.    Among the questions of law and fact common to the Class are whether Bank of America:

a.    Fails to comply with the requirements established under 31 C.F.R. 212, preventing the Bank from freezing, garnishing, or otherwise seizing federally protected funds;

b.    Charges accountholders impermissible fees and penalties as a result of its improper freezing, garnishment, or seizure of federally protected funds, in violation of 31 C.F.R. 212;

c.    Imposes overdrafts and overdraft fees when, but for Bank of America's failure to comply with 31 C.F.R. 212, there would otherwise be sufficient funds in the account;

d.    Fails to provide accountholders with proper notice upon receipt of a garnishment order, as required by 31 C.F.R. 212;

e.    Breached its contract with Plaintiff and other members of the Class through its failure to comply with 31 C.F.R. 212;

f.      Requires its customers to enter into standardized account agreements which include unconscionable provisions  –  specifically those which allow the Bank to apply uniform attorney's fees of $47.50 for processing of garnishments, on top of a "Non-Refundable Processing Fee" of $100 for same;

g.      Converts monies belonging to Plaintiff and other members of the Class through its failure to comply with 31 C.F.R. 212;

h.      Is unjustly enriched through its failure to comply with 31 C.F.R. 212; and

i.      Continues to commit wrongdoing through its failure to comply with 31 C.F.R. 212.

23.     Other questions of law and fact common to the Class include:

a.      The proper method or methods by which to measure damages, and

b.      The declaratory relief to which the Class is entitled.

24.     Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same failure on the part of Bank of America to comply with the federal regulations set forth in 31 C.F.R. 212.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

25.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

26.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Bank of

America, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Bank of America's misconduct will proceed without remedy.

27.     Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.     An Overview of Federal Benefits

#### i.     Social Security Benefits

28.     The Social Security system was created in 1935 in response to the Great Depression. Where the economic devastation gripping the country had subjected many citizens to "the rigors of the poor house," Social Security created a fiscal safety net, protecting the most vulnerable members of society from extreme poverty.[4] At present, approximately one-third of Americans on Social Security rely on the program for over ninety percent of their income.[5] These benefits, therefore, play an essential role in enabling recipients to meet their most basic needs, such as food, medicine, and shelter.

---

[4] Margot F. Saunders and Johnson M. Tyler, Past, Present and Future Threats to Federal Safety Net Benefits in Bank Accounts. 16 N.C. Banking Inst. 43, 44 (March 2012)

[5] John Infranca, Safer Than the Mattress? Protecting Social Security Benefits From Bank Freezes and Garnishments. 83 St. John's L. Rev. 1127 (Fall 2009)

### ii.    Veterans' Benefits

29.    America's firm public policy of caring for its veterans predates the founding of the nation, extending as far back as the Plymouth colony in 1636. From that moment, forward, our country has acknowledged the need, as articulated by Abraham Lincoln, "to care for him who shall have borne the battle and for his widow and his orphan."[6] The Department of Veterans Affairs ("VA"), which oversees the administration of veterans' benefits, provides present and former servicemembers with disability compensation, pension, education, home loans, life insurance, vocational rehabilitation, survivors' benefits, medical benefits, and burial benefits.

30.    While under the best of circumstances the VA offers important – not to mention justly deserved – compensation, the benefits it provides are especially crucial in the current economic environment. Beyond the obvious purpose of caring for servicemember retirees, VA benefits offset the pervasive problem of veteran unemployment. The May 2012 report from the Bureau of Labor Statistics found that, in contrast to a national unemployment rate of 8.2%, the rate among veterans from Iraq and Afghanistan had spiked to 12.7%.[7] For veterans ages 20 to 24, the outlook is even worse, with reports in the past year of an unemployment rate of nearly 30%.[8]

---

[6] Department of Veterans Affairs website (explaining veterans' benefits) (available at http://www.va.gov/opa/newtova.asp)

[7] Bureau of Labor Statistics press release, The Employment Situation – May 2012, Table A-5, Gulf War era II Veterans, at 17. (available at http://www.bls.gov/news.release/archives/empsit_06012012.pdf); *See also* Paul Rieckhoff, Solving the Riddle of Veteran Unemployment, Forbes Online. (Jun. 22, 2012 at 9:30 am) (available at http://www.forbes.com/sites/paulrieckhoff/2012/06/22/solving-the-riddle-of-veteran-unemployment/)

[8] Shaila Dewan, As Wars End, Young Veterans Return to Scant Jobs, New York Times. (Dec. 17, 2011) (available at http://www.nytimes.com/2011/12/18/business/for-youngest-veterans-the-bleakest-of-job-prospects.html?_r=1&pagewanted=all)

### iii.    Railroad Retirement Benefits

31.    Like Social Security, railroad pensions came under federal purview in the 1930s, in an attempt to provide stability for workers and to offset the effects of the Great Depression. Currently, the Railroad Retirement Board (RRB) oversees retirement, survivor, and disability annuities to workers with at least ten years of service. The benefits are financed through railroad retirement taxes paid by both employer and employee.

### iv.    Office of Personnel Management Benefits

32.    The Office of Personnel Management (OPM) manages the civil service of the federal government. Its motto reads *"Recruiting, Retaining and Honoring a World-Class Workforce to Serve the American People."*[9] Explaining the purpose of the Federal Employees Retirement System (FERS), the OPM notes that the "outstanding" program is meant to provide "secure retirement, disability, and survivor benefits for employees and their dependents."[10]

### B.    Statutory Protections of Federal Benefits

33.    Congress has expressly recognized the importance of the above-mentioned federal benefits, most notably by enacting statutes that exempt these funds from garnishment or attachment by creditors seeking payment for outstanding debts. Specifically, Congress has protected

- Social Security and Supplemental Security Income ("SSI") benefits, under 42 U.S.C. § 407(a);

- Veterans' benefits, under 38 U.S.C. § 5301(a)(1);

---

[9] U.S. Office of Personnel Management website (available at http://www.opm.gov/index.asp)

[10] U.S. Office of Personnel Management pamphlet explaining federal benefits, at *4 (September 2005) (available at http://www.opm.gov/HCAAF_Resource_Center/assets/Tal_tool6.pdf)

- Railroad retirement benefits, under 45 U.S.C. § 231m; and

- Benefits provided through the federal retirement program, under 5 U.S.C. § 8470.

34.     These exemption laws were intended to ensure that people such as veterans, Federal pensioners, the disabled, the elderly, or the impoverished could eat, buy medicine, and remain housed.  In an economic climate in which the costs of these necessities continue to climb, federal benefit programs – which recipients have paid into for their entire working existence – sometimes constitute the sole thread by which a citizen's life hangs.  For instance, a recent study found that nearly half of all seniors would be living below the poverty line were it not for Social Security.[11]    Alarmingly, even *with* Social Security, close to 80% of seniors do not have the economic security to sustain their households for the remainder of their lives.[12]

### C.      Twenty-First Century Debt Collection:  Despite Statutory Exemptions, Protected Federal Benefits Are Routinely Garnished

35.     While the above-mentioned federal laws state that creditors cannot take the protected benefits to pay a debt, they do nothing to explain how money deposited directly into bank accounts is to be protected.  Despite the policy underlying the protection these benefits from garnishment or attachment – that if these benefits "are to meet the needs of the poor, [they] must be protected from seizure in legal processes against the beneficiary"[13] – the statutorily-created exemptions were historically affirmative defenses prior to May 1, 2011, to be raised by a debtor in the face of a collection action.

---

[11] Deanne Loonin & Elizabeth Renaurt, The Life and Debt Cycle: The Growing Debt Burdens of Older Consumers and Related Policy Recommendations, 44 Har v. J. on Legis. 167, 170 (2007)

[12] Tatjane Meschede et al., Living Longer on Less: The New Economic (In)Security of Seniors. 1, 12 (2009) (available at http://iasp.brandeis.edu/pdfs/LLOL%20Report.pdf)

[13] H.R. Rep. No. 92-231 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5142

36.     In the last fifteen years the debt collection industry has undergone a sea change. In particular, the use of judicial remedies has skyrocketed. By the middle of the last decade, a regulatory vacuum had come into existence in which creditors would blanket area banks with judgments and subpoenas, and banks would in turn release federal benefits that should have been exempted from garnishment actions. A July 2008 report conducted by the Social Security Administration estimated that, over a one-year period, $177.7 million had been garnished from accounts containing Social Security benefits.[14]

37.     Creditors were not the only ones profiting from these improper levies. The garnishee banks often charge a flat fee – typically $125 – for processing the garnishment order.[15] Upon information and belief, Bank of America charges its customers not only a Non-Refundable Processing Fee of $100, but also an attorney's fee of $47.50 for processing each garnishment order.[16]

38.     Additionally, where the entirety of the account balance is often frozen, any outstanding checks or debit authorizations will add overdraft fees as well.

39.     The results of these actions can be catastrophic. As the protected federal benefits are often the only source of income that recipients have, where an account is improperly

---

[14] Office of the Inspector Gen., Soc. Sec. Admin., Cong. Response Report, Financial Institutions Deducting Fees and Garnishments From Social Security Benefits, A-15-08-28031, at 9 (2008) (available at http://oig.ssa.gov/congressional-response-report-financial-institutions-deducting-fees-and-garnishments-social-security)

[15] Margot F. Saunders and Johnson M. Tyler, *Past, Present and Future Threats to Federal Safety Net Benefits in Bank Accounts.* 16 N.C. Banking Inst. 43, 56 (March 2012)

[16] *See* Letter from Bank of America to Walter D. Clark, *Re: Reference # S061912000236* (Jun. 19, 2012).

garnished and where bank fees stack up as a result of the improper action, citizens are unable to pay for necessities like food, clothing, or shelter for weeks at a time or even longer.[17]

40.     These illegal garnishments of benefits, and the devastation that they cause, eventually attracted media attention and government scrutiny.  The Wall Street Journal covered the issue on its front page in 2007,[18] and Congress subsequently held hearings in 2007 and 2008.[19]   At the hearings, federal bank regulators acknowledged that consumers lacked "adequate" protections from creditors taking Social Security payments from bank accounts.[20]

**D.     The Treasury Department Provides a Solution**

41.     Recognizing that the threat of bank garnishment deterred many recipients of federal benefits from signing up for direct deposit – thus costing the federal government $125 million a year for the administration and mailing of paper checks – the U.S. Department of the Treasury ("Treasury") began meeting with entities like banks, consumer groups, lawmakers, and benefit-dispensing federal agencies in an effort to develop a set of rules to make deposits of federal benefits safe from creditors.

---

[17] Frozen Out: A Review of Bank Treatment of Social Security Benefits:  Hearing Before the S. Fin. Comm., 110th Cong. 4 (2007) (available at http://www.finance.senate.gov/imo/media/doc/092007testms.pdf ) (Statement of Waverly Taliaferro, Social Security beneficiary)

[18] Ellen Schultz, The Debt Collector vs. The Widow:  Viola Sue Kell Thought Her Social Security Benefits Were Safe in the Bank.  She Was Wrong, Wall St. J., Apr. 28, 2007, at A1 (available at http://www.accountantforums.com/wsj-debt-collector-vs-widow-t126201.html)

[19] Frozen Out: A Review of Bank Treatment of Social Security Benefits:  Hearing Before the S. Fin. Comm., 110th Cong. 4 (2007) (available at http://www.finance.senate.gov/imo/media/doc/092007testms.pdf )

[20] Steve Fritts, Assoc. Dir., Risk Mgmt. Policy and Examination Support Branch, Div. of Supervision and Consumer Prot., Fed. Deposit Ins. Corp., Testimony Before the Subcomm. On Soc. Sec. of the H. Comm. On Ways and Means (June 24, 2008), (available at http://www.fdic.gov/news/news/speeches/archives/2008/chairman/spjun2408.html)

42.    On April 19, 2010, Treasury issued a proposed rule "in response to recent developments in technology and debt collection practices that have led to an increase in the freezing of accounts containing Federal benefit payments."[21]    The proposed rule was implemented as an Interim Final Rule on February 23, 2011, and became effective on May 1, 2011.[22]  Codified at 31 C.F.R. § 212 *et seq.*, the Treasury regulation now places an affirmative duty on banks (1) to determine whether the funds of any accountholder served with a garnishment action are exempt federal benefits and, if so, (2) to ensure that the exempted funds are not released, but instead remain available to the accountholder.

**E.    31 C.F.R. § 212 and Its Expansive Protection of Federal Benefits**

43.    31 C.F.R. 212 implements statutory provisions that require financial institutions,[23] upon receipt of a garnishment order from a creditor of one of its account holders, to review deposits made in the account for two months prior to the receipt of the garnishment order.[24]  If, during this "lookback period,"[25] the account has had any benefit payments electronically deposited[26] by a qualifying "benefit agency" – the SSA, VA, OPM, or RRB[27] – then the financial

---

[21] 75 Fed. Reg. 20299 (Apr. 19, 2010).

[22] 76 Fed. Reg. 9939 (Feb. 23, 2011).  Note that Interim Final Rules are considered final rules and have the full force and effect of law.  *See, Career College Ass'n v. Riley*, 74 F.3d 1265, 1268 (D.C. Cir. 1996) ("The key word in the title 'Interim Final Rule,' unless the title is to be read as an oxymoron, is not interim, but final.  'Interim' refers only to the Rule's intended duration--not its tentative nature.")

[23] Defined as "a bank, savings association, credit union, or other entity chartered under Federal or State law to engage in the business of banking."  31 C.F.R. § 212.3

[24] *Id. at* § 212.5

[25] Defined as the "two month period that begins on the date preceding the date of the account review and ends on the corresponding date of the month two months earlier." *Id.* at § 212.3. *E.g.*, an account review commenced on May 19, 2012 will have a lookback period beginning on May 18, 2012, and ending on March 18, 2012.

[26] This regulation only applies where the benefit has been directly deposited. *Id.* at § 212.1

institution must protect from garnishment the lesser of (1) "the sum of all benefit payments posted to an account [during the lookback period]" or (2) "the balance of the account at the open of business on the date of the account review."[28]

44.    Generally, financial institutions must perform the account review no later than two days after receiving the order and confirming that the debtor is, in fact, an account holder with the financial institution.[29]

45.    Amounts determined to be protected, pursuant to the provisions of the regulation, *are exempt from the garnishment order, and must be made available to the account holder.*[30] Further, the financial institution is prohibited from charging or collecting a garnishment fee against the protected amount, or from charging or collecting a garnishment fee after the date of the account review.[31]

46.    To enable financial institutions to easily identify which deposited funds count as "benefit payments" for purposes of 31 C.F.R. 212, on March 12, 2011 the Treasury began encoding Automated Clearing House ("ACH")[32] payments, marking direct deposited funds from the SSA, VA, OPM, and RRB with an "XX" in Positions 54-55 of the "Company Entry

---

[27] The regulation lists only these entities as "benefit agencies," for purposes of both scope and definition. *Id.* at §§ 212.2(b), 212.3.

[28] *Id.* at § 212.3 (defining "protected amount")

[29] *Id.* at § 212.5(a).  Subsection 2 also states that, where creditors submit orders in batches, financial institutions must keep records both of the batches and of the creditor permissions, with regard to the revised timeline for account reviews.

[30] *Id.* at § 212.6(a), (c)

[31] *Id.* at § 212.6(h)

[32] The ACH is the nationwide electronic fund transfer system used for direct deposit transactions and for the exchange of payment-related information among participating financial institutions. FR Proposed Rule for 31 C.F.R. 212, Vol. 75, No. 74, at n. 6 (Apr. 19, 2010)

Description" Field and a "2" in the "Originator Status Code" Field of the Batch Header Record.[33]

These designations are distinct to payments from the above four agencies.[34]

      47.    During the comment period for 31 C.F.R. 212, the banking industry lauded this

coding scheme. In its comment letter to the Treasury, the American Bankers Association[35] stated

that the "identifiers are key to the ability of banks to distinguish benefit payments from other

funds that are commingled in the same account," and that "[t]hese changes to the manner in

which Federal benefit payments are encoded should substantially improve a financial

institution's ability systematically to identify exempt funds in an account during the lookback

process." Letter from Mark Tenhundfeld, American Bankers Association, to Gary Grippo, U.S.

Dept. of Treasury, *Re: Garnishment of Accounts Containing Federal Benefit Payments; Joint

Notice of Proposed Rulemaking*, (Jun. 18, 2010).

      48.    Once the account review has been conducted for a specific garnishment order, the

financial institution may not conduct a subsequent account review for the same order, where it is

served again on the institution.[36] Similarly, the institution may not garnish amounts deposited or

---

[33] *Id.* at \*5

[34] Department of the Treasury, Financial Management Service, *Guidelines for Garnishment of Accounts Containing Federal Benefit Payments*, at \*3 (Mar. 2011) (the guidance notes that financial institutions won't have to implement the procedures until May 2011, and that the 2-month period from the issuance of the guidance until the implementation date of the regulation should serve as a window for banks "to get accustomed to the new encoding and integrate the use of the exemption identifiers into existing processes.")

[35] The American Bankers Association represents itself as "the voice for the nation's $13 trillion banking industry and its two million employees." Letter from Mark Tenhundfeld, American Bankers Association, to Gary Grippo, U.S. Dept. of Treasury, *Re: Garnishment of Accounts Containing Federal Benefit Payments; Joint Notice of Proposed Rulemaking*, (Jun. 18, 2010).

[36] 31 C.F.R. § 212.6(f) (if a new garnishment order is served, the whole process begins again, starting with a new account review)

credited to the account following the date of the account review, or freeze those same funds, unless served with a new garnishment order.[37]

49.    Additionally, a financial institution must serve notice to an account holder, where a garnishment has been served on an account that has received the designated federal benefits within the lookback period.[38]  Among other items of information, the notice must contain:

- the financial institution's requirement under 31 C.F.R. 212 to ensure that account balances up to the protected amount are made available to the account holder;

- the account subject to the order and the protected amount established by the financial institution; and

- a list of the federal benefit payments that are to be protected.

50.    Financial institutions are prohibited from considering any other attributes of a bank account when conducting an account review, including but not limited to

- The presence of funds, from whatever source, that may be comingled in the account with otherwise eligible benefit payments;

- The existence of a co-owner on the account;

- The existence of benefit payments in the account made to multiple beneficiaries and/or from multiple programs;

- The balance in the account, provided that the balance is above zero dollars on the date of the account review;

- Instructions in the garnishment order that are contrary to those in the regulation; or

- The nature of the debt or obligation or the underlying garnishment order.[39]

---

[37] *Id.* at § 212.6(g); Note that under this regulatory scheme, a bank cannot be held liable to a creditor for refusing to release federally protected funds or otherwise refusing to comply with a garnishment order, in compliance with 31 C.F.R. § 212 *et seq.*  *Id.* at § 212.10(b).

[38] *Id* at § 212.6(e)

[39] *Id.* at § 212.5(d)

51.     Financial institutions are required, under this regulation, to maintain records of account activity and actions taken in response to receiving garnishment orders "sufficient to demonstrate compliance" with the regulation.[40]

**F.      Bank of America's Unconscionable Provisions and Policies**

52.     Upon information and belief, Bank of America's policies and practices regarding the protection of exempted funds are unconscionable in the following respects, among others:

        a.      Upon information and belief, the Bank does not disclose or reasonably disclose to customers its obligation, pursuant to 31 C.F.R. 212, to protect from seizure benefits obtained through the SSA, VA, OPM, and/or RRB;

        b.      The Bank has not established a company-wide procedure or policy ensuring compliance with 31 C.F.R. 212, such that customers' accounts are protected from the freezing, garnishment, or other seizure of federally protected benefits;

        c.      The Bank has not established a company-wide procedure or policy ensuring compliance with 31 C.F.R. 212 such that, pursuant to receiving a garnishment order for an account containing federally protected funds, customers receive notification, as is required by 31 C.F.R. 212;

        d.      The Deposit Agreement and related documents are contracts of adhesion, in that they are standardized forms, imposed and drafted by the Bank, which is the party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety; and

        e.      The amount of the fees and penalties associated with garnishments – regardless of whether they are proper or improper – is disclosed in an ineffective, ambiguous,

---

[40] § 212.11(b)

misleading, and unfair manner, since it is not contained in the Deposit Agreement, but rather in a different and separate document, the Fee Schedule, which is not signed by the depositor.

53.     The Bank's policies imposing fees and penalties associated with garnishments are themselves unconscionable.   Such charges are not reasonably related to the Bank's administrative and/or legal expenses.   For instance, upon information and belief, Bank of America charges $47.50 in attorney's fees as an ancillary cost upon receipt of a garnishment. This appears to occur regardless of whether an attorney's services are actually utilized, and also appears to be a flat fee that is not tied to the amount of work that an attorney may or may not have performed in relation to the Bank's processing of the garnishment.

### G.    Bank of America's Failure to Comply With 31 .F.R. 212 Harmed Plaintiff Clark

54.     Plaintiff Clark is and has been a checking account customer of Bank of America.

55.     Plaintiff Clark's has had and continues to have his monthly benefit check from the VA deposited into his Bank of America checking account.

56.     With the exception of rare, miscellaneous, one-time credits for refunds arising out of returned purchases, Plaintiff Clark's VA benefits are the *only* funds that are deposited into his Bank of America account.

57.     On or about June 19, 2012, Bank of America sent a letter to Plaintiff Clark, informing him that the Bank had received a garnishment order, naming Plaintiff Clark as the debtor.  The letter erroneously stated that Bank of America was "required…by law to hold the full amount of the debt," and that additional funds deposited to Plaintiff Clark's account may be subject to hold.   Letter from Bank of America to Walter D. Clark, *Re:   Reference # S061912000236* (Jun. 19, 2012).   The letter also informed Plaintiff Clark that the Bank had garnished $2.58 from his account (upon information and belief, this was the entirety of the

balance of Plaintiff Clark's Bank of America account, at the time that the garnishment was processed). *Id.*

58.    In addition to garnishing Plaintiff Clark's account, Bank of America charged Plaintiff Clark a $100 "Non-Refundable Processing Fee" *and* a $47.50 "attorney's fee." *Id.*

59.    At no point in Bank of America's letter of June 19, 2012 did the Bank provide any of the disclosures required by 31 C.F.R. 212.

60.    Upon information and belief, Bank of America never provided any notification to Plaintiff Clark relating to the garnishment of an account with federally protected funds, as required by 31 C.F.R. 212.

61.    Upon information and belief, Bank of America never performed a review of Plaintiff Clark's bank account, as required by 31 C.F.R. 212, to determine whether the account contained federally protected funds.

62.    Bank of America did not protect *any* amount of funds in Plaintiff Clark's bank account, pursuant to its receipt of the garnishment order.  Instead of making available to Plaintiff Clark (1) the sum of 2 months' worth of protected benefits or (2) the amount of money in his account at the moment of the receipt of the garnishment order, Bank of America improperly facilitated creditors seizing the entirety of the funds in Plaintiff Clark's bank account, and then charged Plaintiff Clark fees and penalties where it was forbidden from doing so under 31 C.F.R. 212.

63.    Additionally, upon improperly releasing Plaintiff Clark's funds and improperly assessing fees and penalties, Bank of America further failed to comply with 31 C.F.R. 212 when it did not send Plaintiff Clark a letter of notification, informing him, *inter alia*, (1) of the Bank's obligation to comply with 31 C.F.R. 212, (2) that his account would contain a protected amount

of funds, to be made available to him despite the garnishment order, and (3) a list of the types of federal benefits protected under 31 C.F.R. 212.

64.     Based on information and belief, the improperly garnished funds of Plaintiff Clark are representative of millions of dollars of improperly garnished funds that Bank of America has wrongfully facilitated from its customers' accounts since 31 C.F.R. 212 went into effect on May 1, 2012; and the garnishment fees and attorney's fees incurred by Plaintiff Clark are representative of millions of dollars of improperly assessed fees that Bank of America has wrongfully assessed and deducted from its customers' accounts, since 31 C.F.R. 212 went into effect on May 1, 2012.

65.     Bank of America's failure to comply with 31 C.F.R. 212, coupled with its wrongful assessment of fees and penalties described above, harmed Plaintiff Clark and members of the Class.  The following allegations regarding the named Plaintiff are made for purposes of illustrating the harm and damage sustained by Plaintiff Clark and members of the Class as a result of Bank of America's wrongful noncompliance with 31 C.F.R. 212 and its improper assessment of fees and penalties, as a result.

**H.     The Damages Sustained by Plaintiff Clark and the Class**

66.     Bank of America's failure or refusal to comply with 31 C.F.R. 212 jeopardizes the financial security of some of its most vulnerable customers, and undermines the public policy behind the very reason that federal benefits are provided, in the first place:  to provide a minimal safety net that allows the poor, the elderly, veterans, or life-long federal employees to ensure that their most basic needs will be met each month.  There is a clear and unwavering legislative and agency intent that federally protected benefits must not be subject to freezes, garnishment, or other seizures arising out of a creditor's action.

67.    As a consequence of Bank of America's garnishment policies and practices, Plaintiff Clark and the Class have been wrongfully forced to pay unnecessary, improper, and illegal fees and penalties.  Bank of America has improperly deprived Plaintiff Clark and the Class of significant funds, causing ascertainable monetary losses and damages.

68.    As a consequence of Bank of America's failure to comply with 31 C.F.R. 212, and thus facilitating the illegal garnishment of federally protected funds, Bank of America has wrongfully deprived Plaintiff Clark and the Class of funds to which it had no legitimate claim.

69.    As a consequence of Bank of America's improper application of fees and penalties stemming from the illegal garnishment of federally protected funds, Bank of America has wrongfully deprived Plaintiff Clark and the Class of funds to which it had no legitimate claim.

70.    Plaintiff Clark should not have had his account garnished, pursuant to 31 C.F.R. 212, and *would not* have had his account garnished, had Bank of America complied with 31 C.F.R. 212.  Similarly, Plaintiff Clark should not have had either the $100 non-refundable processing fee or the $47.50 attorney's fee applied to his account.  Plaintiff Clark and members of the Class were denied access to federally protected benefits, and were assessed improper fees and penalties, because Bank of America failed to comply with federal law.

71.    All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

### FIRST CLAIM FOR RELIEF
### Breach of Contract
### (On Behalf of the National Class)

72.    Plaintiff repeats paragraphs 1 through 70 above.

73.     Plaintiff and members of the Class have contracted with Bank of America for bank account deposit, checking, ATM and debit card services.

74.     One of the essential terms of the contract between Bank of America and Plaintiff and members of the Class is a duty, on the part of the Bank, to safeguard all monies deposited into individual accounts, and to make such funds available upon demand by the accountholder.

75.     Plaintiff and the Class have performed all, or substantially all, of the obligations imposed on them under the terms of their respective contracts with Bank of America.

76.     By facilitating the improper freezing, garnishment, or other seizure of federally protected funds in the individual accounts of Plaintiff and members of the Class, Bank of America did not perform its obligations under each of its contracts with Plaintiff and members of the Class.

77.     By charging fees and penalties arising out of the improper freezing, garnishment, or other seizure of federally protected funds in the individual accounts of Plaintiff and members of the Class, Bank of America did not perform its obligations under each of its contracts with Plaintiff and members of the Class.

78.     By collecting fees and penalties arising out of the improper freezing, garnishment, or other seizure of federally protected funds in the individual accounts of Plaintiff and members of the Class, Bank of America did not perform its obligations under each of its contracts with Plaintiff and members of the Class.

79.     Additionally, under the laws of the states where Bank of America does business, good faith is an element of every contract pertaining to the administration of a bank account. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and

- 24 -

discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power by neglecting to comply with all relevant laws that govern banking, generally, constitute examples of bad faith in the performance of contracts.

80.     Subterfuge and evasion, even if by the omission of an act one is obligated to perform, violate the obligation of good faith in performance even when an actor believes his conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

81.     Bank of America has breached the covenant of good faith and fair dealing through its failure to comply with 31 C.F.R. 212, and its subsequent application of improper penalties and fees, as alleged herein.

82.     Plaintiff and members of the Class have sustained damages as a result of Bank of America's breach of contract and breach of the covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**
**Conversion**
**(On Behalf of the National Class)**

83.     Plaintiff repeats paragraphs 1 through 70 above.

84.     Plaintiff Clark and members of the Class owned or were otherwise entitled to possess the federally protected benefits in their accounts with Bank of America.

85.     Bank of America intentionally took or exercised dominion or control over these federally protected funds by facilitating the freezing, garnishment, or other seizure of federally protected funds, in violation of the rights of Plaintiff Clark and the members of the Class.

86.     In addition, Bank of America intentionally took or exercised dominion over these federally protected funds by collecting fees and penalties from Plaintiff and the members of the Class – assessed in light of the improper freezing, garnishment, or other seizure of federally protected funds – in violation of the rights of Plaintiff Clark and the members of the Class.

87.     Bank of America had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

88.     Bank of America intends to permanently deprive Plaintiff and the members of the Class of these funds.

89.     Plaintiff and the members of the Class are entitled to the immediate possession of these funds.

90.     Bank of America has wrongfully converted these specific and readily identifiable funds.

91.     Bank of America's wrongful conduct is continuing.

92.     As a direct result of this wrongful conversion, Plaintiff and the members of the Class have suffered and continue to suffer damages.

93.     By reason of the foregoing, Plaintiff and the members of the Class are entitled to recover from Bank of America all damages and costs permitted by law, including all amounts that Bank of America has wrongfully converted.

## THIRD CLAIM FOR RELIEF
### Unconscionability
### (On Behalf of the National Class)

94.     Plaintiff repeats paragraphs 1 through 70 above.

95.     Bank of America's garnishment policies and practices are substantively and procedurally unconscionable in the following respects, among others:

a.     The Bank does not disclose or reasonably disclose to customers its obligation, pursuant to 31 C.F.R. 212, to protect from seizure benefits obtained through the SSA, VA, OPM, and/or RRB;

b.     Upon information and belief, the Bank has not established and implemented a companywide procedure or policy ensuring compliance with 31 C.F.R. 212, such that customers' accounts are protected from the freezing, garnishment, or other seizure of federally protected benefits;

c.     Upon information and belief, the Bank has not established and implemented a company-wide procedure or policy ensuring compliance with 31 C.F.R. 212 such that, pursuant to receiving a garnishment order for an account containing federally protected funds, customers receive notification, as is required by 31 C.F.R. 212;

d.     The Deposit Agreement and related documents are contracts of adhesion, in that they are standardized forms, imposed and drafted by the Bank, which is the party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.     The amount of the fees and penalties associated with garnishments is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained

in the Deposit Agreement, but rather in a different and separate document, the Fee Schedule, which is not signed by the depositor; and

        f.      The amount of the fees and penalties associated with garnishments is itself unconscionable as, upon information and belief, Bank of America not only charges an exorbitant "Non-Refundable Processing Fee" of $100 when presented with a garnishment order for an account holder, but it *also* charges a uniform attorney's fee of $47.50.

96.      Considering the great business acumen and experience of Bank of America in relation to Plaintiff and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

97.      The imposition of fees and penalties associated with garnishments is itself unconscionable.  Such charges are not reasonably related to the Bank's administrative and/or legal expenses.

98.      Plaintiff Clark and members of the Class have sustained damages as a result of Bank of America's unconscionable policies and practices as alleged herein.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of the National Class)**

99.      Plaintiff repeats paragraphs 1 through 70 above.

100.      Plaintiff Clark, individually and on behalf the Class, asserts a common law claim for unjust enrichment.

101.   By means of Bank of America's wrongful conduct alleged herein, Bank of America knowingly provides banking services to Plaintiff and members of the Class that are unfair, unconscionable, and oppressive.

102.   Bank of America knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Class.  In so doing, Bank of America acted with conscious disregard for the rights of Plaintiff and members of the Class.

103.   As a result of Bank of America's wrongful conduct as alleged herein, Bank of America has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

104.   Bank of America's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

105.   Under the common law doctrine of unjust enrichment, it is inequitable for Bank of America to be permitted to retain the benefits it received, and is still receiving, without justification, from allowing the improper freezing, garnishment, or other seizure of federally protected funds, and for assessing fees and penalties stemming from these seizures, against Plaintiff and members of the Class in an unfair, unconscionable, and oppressive manner.  Bank of America's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

106.   The financial benefits derived by Bank of America rightfully belong to Plaintiff and members of the Class.  Bank of America should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds received by them.

107.   Plaintiff and members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class demand a jury trial on all claims so triable and judgment as follows:

1.     Declaring Bank of America's garnishment policies and practices to be wrongful, unfair and unconscionable;

2.     Compensatory Damages and Restitution in the amount of all garnished funds and related garnishment fees, attorneys fees and overdraft fees paid to Bank of America by Plaintiff and the Class, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.     Disgorgement of the ill-gotten gains derived by Bank of America from its misconduct;

4.     Actual damages in an amount according to proof;

5.     Pre-judgment interest at the maximum rate permitted by applicable law;

6.     Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

7.     Such other relief as this Court deems just and proper.

Dated: August 20, 2012.

Respectfully submitted,

Hank Bates, ABN 98063
Randall K. Pulliam, ABN 98015
CARNEY WILLIAMS BATES
PULLIAM & BOWMAN
11311 Arcade Drive; Suite 200
Little Rock, Arkansas 72212
Telephone: (501) 312-8500
Fax: (501) 312-8505
hbates@carneywilliams.com

BY: _____
HANK BATES, ABN 98063